**Tom and Diane PAYTON, on behalf of themselves and others similarly situated, Appellants,**

v.

**STATE of Alaska and Frank Rue, in his official capacity as Commissioner of Fish and Game, Appellees.**

No. S–7557.

Supreme Court of Alaska.

June 13, 1997.

William E. Caldwell, Alaska Legal Services Corporation, Fairbanks, for Appellants.

Kevin M. Saxby, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellees.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

FABE, Justice.

## I. INTRODUCTION

Tom and Diane Payton seek to have a subsistence fishery created in the upper Yentna River area. The Board of Fisheries (Board) denied the Paytons' repeated proposals for such a fishery, and the Paytons appealed to the superior court. The superior court granted summary judgment against the Paytons, concluding that (1) the Board correctly interpreted statutory and regulatory provisions relating to subsistence and (2) there was ample evidentiary support for the Board's finding that current uses of salmon in the upper Yentna River area were not sufficiently customary and traditional to qualify as subsistence uses. On appeal, the Paytons challenge both of these conclusions. We reverse the superior court's decision with directions to remand this case to the Board for further proceedings.

## II. FACTS AND PROCEEDINGS

The Paytons moved to Skwentna near the upper Yentna River in 1975. Since then, they have submitted to the Board several proposed regulations that would establish a subsistence fishery in the upper Yentna River area.

The Board considered the Paytons' first proposal, Proposal 405, at its March 1988 meeting. During its deliberations, the Board recognized that to consider Proposal 405, it had to determine whether current uses of salmon in the upper Yentna River area were

"customary and traditional."[1] Therefore, it proceeded to apply the criteria for identifying customary and traditional subsistence uses set forth in a regulation of the Joint Boards of Fisheries and Game.[2] The Board heard reports and statements from several individuals. Near the end of this testimony, Board members expressed particular interest in how long residents of the Skwentna area had been taking salmon and whether current residents' methods of handling, preparing, and sharing salmon reflected knowledge that had been handed down by prior generations.

The Board learned that the population of the upper Yentna River area had fluctuated radically throughout history. During the 19th century "several hundred" Alaska Natives occupied villages in the area. However, following the departure of many residents and the onslaught of a devastating influenza epidemic, the population dwindled. The area continued to experience extreme population swings until the 1980s, when the population steadily rose to approximately 150–200 persons in 1987.

Due to this fluctuation, research presented to the Board by the Division of Subsistence indicated that 20% of the population of the upper Yentna River area had been there for more than twenty years, while 63.6% had been there less than ten years. The research also showed that the average length of residency in the area was about eight years. However, testimony revealed that this population study did not reflect "a number of households" that had been there since the 1920s and 1930s but whose members had died or moved away just prior to the study.

The Board also learned that historically the Alaska Native residents of the area dried, smoked, and fermented salmon and that "much of the fish and game harvest taking place in the area today [is] preserved by methods not requiring electricity such as smoking, canning, jarring, [and] freezing out of doors." Upon specific inquiry by the Board, the division compared preservation methods in the upper Yentna River area to those in Tyonek, English Bay, and Port Graham, where the Board had already established subsistence fisheries. It explained that people in those villages smoke, dry, and can salmon as well as freeze it in electric freezers.

The Board received little testimony about the extent to which upper Yentna River area residents shared salmon. The division reported that "we know that sharing and distribution of resources is common, mostly at the

---

1. In 1988, the applicable subsistence statute required the Board to "identify the fish stocks ... or portions of stocks ... that are customarily and traditionally used for subsistence." Former AS 16.05.258(a) (1987).

2. That regulation provided in part:
(b) Customary and traditional subsistence uses by rural Alaska residents will be identified by use of the following criteria:
(1) a long-term, consistent pattern of use, excluding interruption by circumstances beyond the user's control such as regulatory prohibitions;
(2) a use pattern recurring in specific seasons of each year;
(3) a use pattern consisting of methods and means of harvest which are characterized by efficiency and economy of effort and cost, and conditioned by local circumstances;
(4) the consistent harvest and use of fish or game which is near, or reasonably accessible from, the user's residence;
(5) the means of handling, preparing, preserving, and storing fish or game which has been traditionally used by past generations, but not excluding recent technological advances where appropriate;

(6) a use pattern which includes the handing down of knowledge of fishing or hunting skills, values and lore from generation to generation;
(7) a use pattern in which the hunting or fishing effort or the products of that effort are distributed or shared among others within a definable community of persons, including customary trade, barter, sharing, and gift-giving; customary trade may include limited exchanges for cash, but does not include significant commercial enterprises; a community may include specific villages or towns, with a historical preponderance of subsistence users, and encompasses individuals, families, or groups who in fact meet the criteria described in this subsection; and
(8) a use pattern which includes reliance for subsistence purposes upon a wide diversity of the fish and game resources of an area, and which provides substantial economic, cultural, social, and nutritional elements of the subsistence user's life.
5 Alaska Administrative Code (AAC) 99.010(b)(1982). The current version of this regulation reflects several amendments. *See* 5 AAC 99.010.

sub-community level." The division explained that several households in the upper Yentna River area share salmon with each other. However, it apparently did not have sufficient information to respond to the Board's questions about whether the pattern of sharing in Tyonek, English Bay, and Port Graham was significantly different.

Based upon this testimony, the Board concluded that there was insufficient evidence that current uses of upper Yentna River area salmon were customary and traditional. Although the Board did not make written findings in March 1988, some members orally expressed why they voted the way they did. The Chair, Gary Slaven, explained:

I don't hear any talk of traditional fish camps, smoke house areas, traditional fishing areas. I note that many of these communities from the information we've been given are land lottery communities which aren't even the same communities that people lived in prior to the 1950's. I note that the population dynamics of the area seem to be very mobile and it seems to be a transient population that comes and goes so I can't—I can't find anywhere in the information I've been given or in the public testimony that—that there's any sort of large proportion of people who've lived here for long enough to even have established a generation to generation customary and traditional use, and for those reasons and for the reasons that the population is increasing dramatically there since 1980 ... I just can't vote to find that there are customary and traditional use of the fish stocks by the people....

Other members appeared to agree with Slaven, and all of them voted against a motion to find that the uses were customary and traditional.[3]

After the Board rejected Proposal 405, the Paytons submitted a second proposal, Proposal 7, which the Board considered in December 1988. The first individual to testify, Dr. Jim Fall of the Division of Subsistence, indicated that Proposal 7 was "virtually iden-

tical" to Proposal 405. He stated that the division possessed no research or data that had not already been presented to the Board during the March 1988 hearings relating to Proposal 405.

The Board agreed that Proposal 7 was substantially similar to Proposal 405 and rejected the proposal for the same reasons. The Board subsequently drafted written findings to record its basis for rejecting the proposals. These written findings contained eight items, each of which related to one of the eight criteria for determining whether uses of salmon are "customary and traditional." Of particular relevance to this case, the Board found that

(1) although there was evidence that the area in question had a long-term use pattern by a variety of people, that pattern has been significantly interrupted as different groups of people moved in and out of the area....

....

(5) public testimony and information from the Subsistence Division indicated that most people can, smoke, or freeze salmon. There is no evidence that local fishermen split or dry salmon, a common practice in other subsistence fisheries in the Cook Inlet region. The practice of splitting and drying salmon is one that is handed down from one generation to another in this region....

(6) there was also no information to indicate that current area residents developed use patterns based on knowledge of fishing skills, values, and lore which was handed down from generation to generation since the families in the area have not been in the area for successive generations. Although the area has been continuously populated by a small number of year-round residents since the 1920's, there is no evidence that families remained in the area for more than one generation.... This pattern is in direct contrast to the pattern in other Cook Inlet subsistence communities such as Tyonek, English Bay, and Port

3. One member stated that "unless some of the things that other Board members come up with here now can get me onto a different train of thought or somehow change my mind, I'm going to support the motion to declare that they do have long term historical use." Something must have changed this member's mind, because he voted against the motion.

Graham where the younger generations have continued to reside in the same communities as their parents and grandparents;

(7) although the information presented did indicate that people in the area may share salmon with neighbors, they do not appear to have developed a systematic pattern of sharing based on kinship ties of historical practices; and finally

(8) the use pattern established in the current community does not demonstrate that the community substantially relies on the salmon resource for its economic, cultural, social and nutritional needs in the same way that other customary and traditional users in this region do (Tyonek, Port Graham, and English Bay). Although the information the board received does indicate that local harvests of fish and game are diverse and that salmon constitute approximately 25% of the total resource harvests, there is no long term, consistent pattern of ties to the area and to the dependence on the area's resources.

After the Board rejected Proposal 7, the Paytons filed a lawsuit in superior court to challenge the Board's actions. The superior court granted summary judgment against the Paytons, who appealed to this court. While the Paytons' appeal was pending, we issued our decision in *McDowell v. State*, 785 P.2d 1 (Alaska 1989). We subsequently concluded that *McDowell* had mooted the Paytons' appeal.[4]

A few months later, on March 23, 1992, the Paytons filed with the Board a third petition, Proposal 362, for a subsistence fishery in the upper Yentna River area. As with Proposals 405 and 7, the Board recognized that it could not properly consider Proposal 362 without first determining whether current uses of upper Yentna River area salmon were customary and traditional. The Board was advised that the regulatory criteria for finding a use to be customary and traditional were "substantially the same" as the criteria applicable to its decisions about Proposals 405 and

7. Therefore, during the Proposal 362 hearings, Board members focused on whether there was any new information that would cause them to disavow their prior conclusions that current uses of upper Yentna River salmon were not customary and traditional.

The Division of Subsistence orally informed the Board that it had collected no new data since the Board's hearings on Proposal 7. However, the division's written report to the Board stated: "In the [Proposal 405] worksheet, it is implied that Dena'ina Athabaskans did not use this area after 1934. In fact, uses by Dena'ina ... occurred until the early 1960s." The division also noted that it had "information from taped interviews with Skwentna area residents regarding Criterion 6, 'intergenerational transmission of knowledge' which was not included in the [Proposal 405] worksheet; this information can be summarized orally if there are questions about it from Board members." Despite the fact that the Board neither reviewed nor asked questions about those taped interviews, its members apparently concluded that there was no new information that would cause them to revise their 1988 findings and voted unanimously to reject Proposal 362.

On February 25, 1994, the Paytons brought this action to challenge the Board's decision to reject Proposal 362. The parties filed cross-motions for summary judgment as to the Paytons' claims under AS 16.05.258 and its implementing regulations. On October 6, 1995, the court denied the Paytons' motion and granted the State's motion. The court held:

> Unquestionably, the Board of Fisheries could have decided this case favorably for the [Paytons], but it appears equally clear that the Board's decision against the [Paytons] is amply supported by the evidence that was presented to it and that the Board's interpretation and application of the statutory and regulatory provisions was correct.

---

4. *McDowell* invalidated language in the 1986 subsistence legislation that made subsistence preferences available only to residents domiciled in a rural area of the state. *McDowell*, 785 P.2d

at 12. We determined that this significant change in the law made it impossible to review the Paytons' appeal in a meaningful way.

After the superior court entered partial final judgment against them, the Paytons appealed.

On appeal, the Paytons claim that the Board violated AS 16.05.258 and 5 AAC 99.010(b) when it rejected Proposal 362. Specifically, the Paytons assert that the Board erred by construing 5 AAC 99.010(b) in a manner that is inconsistent with AS 16.05.258. They also contend that the Board applied its regulations arbitrarily and unreasonably. The State responds by arguing that the Paytons' appeal is moot. Alternatively, the State contends that the Board did not err when it rejected Proposal 362.

### III. STANDARD OF REVIEW

■ We review the superior court's grant of summary judgment *de novo*. *Nielson v. Benton*, 903 P.2d 1049, 1052 (Alaska 1995). The Paytons do not contend that there are disputed issues of material fact that preclude summary judgment. Instead, they assert that the Board's December 1988 written findings, which were incorporated into the 1992 decision, demonstrate that the Board misinterpreted 5 AAC 99.010. We review the Board's interpretation of its own regulation under the "reasonable basis" standard. *Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska 1982)("[W]here an agency interprets its own regulation ... a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue."). However, insofar as our review requires us to determine the meaning of "customary and traditional" in AS 16.05.258, we exercise our independent judgment. *Madison v. Alaska Dep't of Fish & Game*, 696 P.2d 168, 173 (Alaska 1985).

The Paytons also allege that the Board's written findings demonstrate that the Board erred when it applied 5 AAC 99.010 to the facts of their case. Faced with a similar question in *Rose*, we held that once the interpretation of the applicable regulation is resolved, "the [agency's] application of the 'law' to the particular factual circumstances ... is a matter committed to the [agency's] sound discretion. Consequently, 'our scope of review is limited to whether the decision was

arbitrary, unreasonable or an abuse of discretion.'" 647 P.2d at 161 (quoting *State, Dep't of Admin. v. Bowers Office Prods., Inc.*, 621 P.2d 11, 13 (Alaska 1980)).

### IV. DISCUSSION

#### A. The Paytons' Appeal Is Not Moot.

■ The State asserts that the Paytons' appeal is moot because on February 27, 1996, the Board conducted additional proceedings relating to whether current uses of upper Yentna River area salmon are customary and traditional. During those proceedings, the Board considered a fourth proposal by the Paytons for a subsistence fishery near Skwentna. Although it rejected the proposal, the Board created a new personal use fishery in the area.

The State argues that the 1996 action, which the Paytons have not included in their appeal, "supersede[s]" the 1992 decision that the Paytons challenge: "[i]f this Court were to invalidate or remand the Board's 1988 and 1992 findings, it would be unclear what effect, if any, such a result would have on the 1996 findings because they have not been put at issue."

■ We will not decide questions where the facts have rendered the legal issues moot. *O'Callaghan v. State*, 920 P.2d 1387, 1388 (Alaska 1996). "A case is moot if the party bringing the action would not be entitled to any relief even if they prevail." *Id.* (quoting *Maynard v. State Farm Mut. Auto. Ins. Co.*, 902 P.2d 1328, 1329 n. 2 (Alaska 1995)).

We conclude that this case is not moot. Although the 1996 decision created a personal use fishery, "personal use fishing" is not a "subsistence use" and, thus, is not entitled to the subsistence preference that the Paytons seek in this action. *Compare* AS 16.05.940(24) *with* AS 16.05.940(32). Moreover, the Board based its 1996 decision solely upon its 1988 written findings, which were also the basis for the 1992 decision. Thus, the Board did not decline to create a subsistence fishery in 1996 for any reason not already incorporated into the 1992 decision. Under these circumstances, the 1996 decision does not, as the State suggests, provide the

Board with a sound basis to deny the Paytons' requested relief even if they prevail in this action.

B. *The Board Erred When It Denied the Paytons' 1992 Proposal for a Subsistence Fishery.*

1. *The Board erroneously required a familial relationship between current and past generations of users of upper Yentna River area salmon.*

The Paytons argue that the Board declined to find that current uses of upper Yentna River area salmon are customary and traditional because it improperly construed 5 AAC 99.010 to require successive generations of related individuals to have used the salmon. They contend that the Board "engrafted onto the law" "successive generations" and "kinship" requirements that are inconsistent with the language of 5 AAC 99.010(b) and the meaning of "customary and traditional" in AS 16.05.258. The State responds that subsistence laws protect only "ongoing, historical uses" and that its references in its 1988 written findings to the dearth of successive generations in the upper Yentna River area indicated that uses of salmon in the area were neither ongoing nor historical.

We conclude that the Board did not err in considering the presence of "successive generations," but that it did err when it required the current users of salmon to be related to past generations of users. In its 1988 written findings, which were incorporated into the 1992 decision, the Board referred to the lack of multigenerational families in the upper Yentna River area in its discussion of criteria one, five, six, seven, and eight. Indeed, the absence of multiple generations appears to be the principal reason that the Board declined to create a subsistence fishery. In the summary of its decision, the Board stated:

> [W]hile it is certainly true that the residents of this area fish ..., these characteristics are the result of a desire to move to a remote area and establish this type of life style rather than the continuation of a life style that has existed in a stable population of multigenerational families with a history of subsistence uses in the area.

The board believes that the current subsistence law was designed to protect ongoing uses of fish and fishing practices—practices that existed in the the [sic] distant past and have been carried on through successive generations....

Despite repeated legal challenges to and multiple revisions of the subsistence laws, "subsistence uses" have long been defined in terms of "customary and traditional uses." *Compare Madison v. Alaska Dep't of Fish & Game*, 696 P.2d 168, 170 n. 4 (Alaska 1985) *with* AS 16.05.940(32). Accordingly, we consistently have interpreted "customary and traditional" to refer to "uses" rather than "users." *State v. Morry*, 836 P.2d 358, 368 (Alaska 1992); *McDowell v. State*, 785 P.2d 1, 9 n. 19 (Alaska 1989); *Madison*, 696 P.2d at 174.

We disagree with the Paytons that our interpretation of "customary and traditional" prohibits the Board from considering how successive generations of Skwentna-area residents used salmon. The statutory definition of "customary and traditional" refers to "long-term" and "consistent" uses of fish. AS 16.05.940(7). As the State points out, "customary" means "commonly practiced, used, or observed" or "familiar through long use or acquaintance." *Webster's New International Dictionary* 559 (3d ed. 1969). And one meaning of "traditional" is "handed down from age to age without writing." *Id.* at 2422. Thus, the Board was charged with determining whether users of salmon in the upper Yentna River area currently practice methods of catching, preparing, and sharing salmon that were "handed down from age to age." Such an inquiry demands that the Board investigate the activities of current and long-time residents of the area. Insofar as the Board made this inquiry in its written findings, it did not err.

However, the Board went further than simply determining whether current residents had learned subsistence traditions from prior generations of persons who had used upper Yentna River salmon for subsistence: it required a familial relationship between current residents and those prior generations. This is evident from the Board's

reference to "multigenerational families" in its summary of its 1988 findings, as well as from its findings relating to specific criteria. For example, in examining criterion six, the Board noted that "there was also no information to indicate that current area residents developed use patterns based on knowledge of fishing skills, values, and lore which was handed down from generation to generation since the families in the area have not been in the area for successive generations." Similarly, with respect to criterion seven, the Board concluded that the "people in the area ... do not appear to have developed a systematic pattern of sharing based on kinship ties of historical practices." Finally, the Board's findings for criteria one and eight indicate that current residents of the upper Yentna River area were not adequately relying on salmon because they had "no long term consistent pattern of ties to the area" and were not perpetuating a "long-term use pattern" because their households were "newly established."

■ The plain language of AS 16.05.258(a) and AS 16.05.940(7) and our prior decisions emphasize that "customary and traditional" refers to "uses" and "use patterns" of fish stocks. None of these authorities indicates that a use of fish may be customary and traditional only if current users are related by blood to past generations who used the fish in essentially the same way. Instead,

the focus is whether the use has occurred consistently for an extended period of time.

This interpretation is consistent with the legislative history of the 1992 amendments to the subsistence laws. Section 1 of chapter 1, Second Special Session Laws Amended (SSSLA) 1992 contains legislative findings regarding the purpose and intent of the 1992 subsistence revisions. In those findings, the legislature stated that "customary and traditional uses of Alaska's fish and game originated with Alaska Natives, and have been adopted and supplemented by many non-Native Alaskans as well." Ch. 1, § 1(a)(3), SSSLA 1992.[5] Because the legislature recognized that customary and traditional uses can be "adopted" and "supplemented," the legislature apparently did not limit the meaning of customary and traditional uses to only those uses that are handed down from parent to child or relative to relative.

Therefore, we conclude that the Board's interpretation of 5 AAC 99.010(b) violated AS 16.05.258(a) because it erroneously required current users of salmon in the upper Yentna River area to be related to prior generations of users in the area rather than focusing on whether the fish stocks "are customarily and traditionally taken or used for subsistence." AS 16.05.258(a). By construing the regulation the way it did, the Board inappropriately restricted the Paytons' ability to establish a subsistence fishery.[6]

---

5. The legislature's findings also provide:
    (1) there are Alaskans, both Native and non-Native, who have a traditional, social, or cultural relationship to and dependence upon the wild renewable resources produced by Alaska's land and water; the harvest and use of fish and game for personal and group consumption is an integral part of those relationships;
    (2) although customs, traditions, and beliefs vary, these Alaskans share ideals of respect for nature, the importance of using resources wisely, and the value and dignity of a way of life in which they use Alaska's fish and game for a substantial portion of their sustenance; this way of life is recognized as "subsistence"[.]
    Ch. 1, § 1(a)(1)-(2), SSSLA 1992.

6. AS 16.05.940(32) limits "subsistence uses" to uses for "direct personal or family consumption ... and for customary trade, barter, or sharing for personal or family consumption." The State notes the similarity between this language and that of 5 AAC 99.010(b)(7), which requires the

Board to identify customary and traditional uses of resources after considering the possible existence of "a pattern of taking, use, and reliance where the harvest effort or products of that harvest are distributed or shared, including customary trade, barter, and gift-giving." Based upon this similarity, the State asserts that it was appropriate for the Board to conclude that Skwentna-area residents do not have "a systematic pattern of sharing based on kinship ties of historical practices."

However, similarities between AS 16.05.940(32) and 5 AAC 99.010(b)(7) should not be construed to permit the Board to require a familial relationship between current and prior generations of users of upper Yentna River area salmon. The regulation does not refer to "kinship." See 5 AAC 99.010(b)(7). And, if we interpreted the statute to mean that sharing must occur with family members only, the phrase "for direct personal or family consumption" in AS 16.05.940(32) would take on the same meaning as the words "sharing for personal or family

■ Moreover, this error cannot be characterized as harmless error. The Paytons asserted that they and other residents of the upper Yentna River area learned subsistence skills, values, and lore from long-time, albeit unrelated, residents of the Skwentna area.[7] Plus, the Division of Subsistence uncovered evidence that might support the Paytons' position. In 1992, the division informed the Board that it possessed new "information from taped interviews with Skwentna area residents regarding Criterion 6, 'intergenerational transmission of knowledge.'" Although the division notified the Board that "this information can be summarized orally if there are questions about it from Board members," the Board neither played the tapes nor asked questions about them. Based upon these portions of the record and the Board's interpretation of 5 AAC 99.010(b)(6), we conclude that the Board erred when it denied the Paytons' Proposal 362.

2. *The Board erred when it concluded that current users of salmon in the upper Yentna River area do not handle, prepare, preserve, and store salmon based on traditional practices.*

■ Criterion five of 5 AAC 99.010(b) requires the Board to identify customary and traditional uses of fish by considering whether there exists "a means of handling, preparing, preserving, and storing fish ... that has been traditionally used by past generations, but not excluding recent technological advances where appropriate." 5 AAC 99.010(b)(5). The Board concluded that this criterion weighed against the Paytons because residents of the upper Yentna River area do not split and dry salmon as do residents of the three recognized Native subsistence villages in the Cook Inlet region.

We conclude that the Board's criterion five finding is erroneous. The record indicates that historically the Alaska Natives in the Skwentna area dried, smoked, and fermented salmon and that "since that time in the 20's through the 50's and on" residents dried, smoked, salted, canned, and jarred salmon. Current methods are similar in that residents smoke, can, and jar salmon; the only difference is that current residents freeze salmon out-of-doors but do not dry it. However, criterion five specifically permits residents to stop using certain methods based upon "technological advances where appropriate." 5 AAC 99.010(b)(5). It was error for the Board not to explain why this statutory exception does not justify Skwentna-area residents' failure to dry salmon. Moreover, the taped interviews that the Board failed to consider in 1992 may have some bearing on whether the Paytons satisfy criterion five.[8]

---

consumption." We decline to interpret AS 16.05.940 in this manner. *See Alascom, Inc. v. North Slope Borough, Bd. of Equalization,* 659 P.2d 1175, 1178 n. 5 (Alaska 1983) (concluding that statutes should be construed so that no part will be superfluous).

7. The only record evidence of this intergenerational transmission of knowledge is in two affidavits attached to the Paytons' 1992 proposal for a subsistence fishery. In the first, Tom Payton stated that he was "given the knowledge of the customs and traditions of the subsistence uses of fish ..., the skills, and the values and lore of the Skwentna area by residents who have passed such knowledge down from previous generations." In the other affidavit, Annabelle Shellabarger, who had lived in Skwentna for over sixty-two years before her death, stated that she learned subsistence fishing methods that were "customary and traditional of the residents of this area at such time that I moved here." She also stated, "I have handed down knowledge of fishing ... skills, and values and lore to my family, Tom and Dianne Payton, and to other residents of Skwentna in the same manner and respect that such knowledge was handed down to me from numerous old-time residents of the Skwentna area."

8. The Paytons also challenge the Board's finding concerning criteria three and four. The finding relating to criterion three provides:

(3) although the gear used in the early part of this century and later during the 1950's could be characterized as efficient and cost effective (traps, weirs, fishwheels and set gill nets), current gear has been dictated by regulation and since statehood, rod and reel fishing under sport fishing regulations has been the only legal means for taking salmon in this region[.]

The Board erred in basing its finding upon upper Yentna River area residents' failure to use "methods and means" of harvesting fish that are prohibited by regulation. Criterion one prohibits the Board from finding that a "long-term consistent pattern" of taking does not exist simply because regulations have prohibited such a pattern from continuing. *See* 5 AAC 99.010(b)(1). "It is fundamental that legislation should be construed so as to harmonize its various elements

### C. Related Determinations by the Joint Boards of Fisheries and Game and the Board of Game Do Not Require the Board of Fisheries to Accept Appellants' Proposal.

Finally, the Paytons assert that related determinations by the Joint Boards of Fisheries and Game and the Board of Game require the Board of Fisheries to establish a subsistence fishery in the upper Yentna River area. The Paytons point out that the Board of Game has recognized that the upper Yentna River area is within a subsistence area for hunting. They also note that a few days before the Board met to discuss the Paytons' Proposal 362, the Joint Boards of Fisheries and Game excluded the upper Yentna River area from a "nonsubsistence area" where that term is defined as "an area or community where dependence upon subsistence is not a principal characteristic of the economy, culture, and way of life." AS 16.05.258(c).

■ We conclude that neither of these decisions impacts the Board's 1992 decision concerning Proposal 362. As the State points out, the Board of Fisheries and the Board of Game are separate entities acting under different statutory authority; they may reach different conclusions based on the same facts. Moreover, the Board of Game's finding relates to a larger area than the finding by the Board of Fisheries. See 5 AAC 92.450(16)(B). Therefore, the Board of Game's decision does not limit the Board of Fisheries' finding with respect to Proposal 362.

Similarly, the Joint Board of Fisheries and Game's nonsubsistence area finding is consistent with the Board of Fisheries' decision concerning Proposal 362. Exclusion of a community from a nonsubsistence area does not necessarily mean that the community is entitled to a subsistence preference. This is apparent from the structure of AS 16.05.258. The "nonsubsistence area" provisions in subsection (c) set forth procedures for excluding areas from being considered for subsistence preferences. However, decisions to grant subsistence rights are governed by subsections (a) and (b). Thus, to determine that areas excluded from "nonsubsistence areas" are automatically "subsistence areas" would not be consistent with AS 16.05.258.

## V. CONCLUSION

The Board erroneously required current users of salmon in the upper Yentna River area to have a familial relationship with prior generations of subsistence users in the area. We determine that this interpretation of 5 AAC 99.010(b) is inconsistent with AS 16.05.258(a) and AS 16.05.940(7). We also conclude that the Board failed to explain adequately why it determined 5 AAC 99.010(b)(5) does not favor a finding that uses of upper Yentna River area salmon are customary and traditional. Therefore, we REVERSE and REMAND the superior court's decision with directions to remand the matter to the Board. On remand, the Board should reevaluate the Paytons' subsistence fishery Proposal 362 in a manner consistent with this opinion, in light of the evidence in the record and the taped interviews that it failed to

without doing violence to its language or spirit." *Hartford Fire Ins. Co. v. Macri*, 4 Cal.4th 318, 14 Cal.Rptr.2d 813, 842 P.2d 112, 116 (1992). Following this principle, the Paytons should not be faulted under criterion three for failing to use "methods and means" that are prohibited by regulation.

As to criterion four, the Board found:

(4) evidence before the board indicated that people in this area probably do take fish and game that are reasonably accessible from their homes and do not regularly travel to other parts of Alaska [to] fish for salmon or hunt. However, this is also [the] case for the majority of Alaskans[.]

The Paytons assert that the Board inappropriately minimized the weight it gave to this criterion.

It is within the discretion of the Board to give each of the eight criteria appropriate weight, but it must do so in a reasonable manner. *See Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska 1982) (applying a deferential standard of review when an agency interprets its own regulation). The record contains no evidence that supports the Board's statement about "the majority of Alaskans." Nor is it clear why that statement, even if true, merits discounting the importance of criterion four relative to the other criteria. Therefore, we cannot determine whether the Board reasonably weighed criterion four. On remand, the Board should provide reasons based upon record evidence for the relative weight that it gives to its findings concerning each of the eight criteria.

review in 1992. In doing so, it may allow the parties to present additional evidence.[9]

---

9. For example, insofar as the Board's mistaken understanding of applicable law may have influenced the questions it posed government witnesses, such as the Division of Subsistence, it may need to question these witnesses again.