THE ALASKA FISH & WILDLIFE CON-SERVATION FUND and The Chitina Dipnetters Association, Inc., Appellants and Cross–Appellees,

v.

STATE of Alaska, DEPARTMENT OF FISH & GAME, BOARD OF FISHER-IES, and Ahtna Tene Nené, Appellees and Cross–Appellants.

Nos. S–14079, S–14099.

Supreme Court of Alaska.

Dec. 7, 2012.

Michael C. Kramer, Borgeson & Kramer, Fairbanks, for Appellants/Cross–Appellees.

Lance B. Nelson, Senior Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee/Cross–Appellant, State of Alaska.

John M. Sky Starkey, Anchorage, for Appellee/Cross–Appellant, Ahtna Tene Nené.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

In 1999, the Board of Fisheries (the Board) made a positive customary and traditional use finding in the Chitina subdistrict for the first time, thereby changing it from a "personal use" to a "subsistence" fishery. The Board reversed this decision in 2003,

returning Chitina to a personal use fishery. The Alaska Fish and Wildlife Conservation Fund (AFWCF) and the Chitina Dipnetters Association, Inc., after asking the Board to reconsider its 2003 finding in both 2005 and 2008,[1] brought this suit to challenge the Board's negative customary and traditional use finding for Chitina. They claimed that the regulation used by the Board to make such a finding, 5 Alaska Administrative Code (AAC) 99.010(b), was unconstitutional on its face and as applied. The superior court held that the regulation was valid and constitutional, but remanded for the Board to fully articulate the standard being used in its application of 5 AAC 99.010(b)(8). It also instructed the Board not to consider "the per capita consumption of wild food in the home community of various users" upon remand. On remand, the Board codified a definition of "subsistence way of life," allowed the parties to submit evidence, and upheld its previous classification. Because 5 AAC 99.010(b) is consistent with its authorizing statutes, is reasonable and not arbitrary, does not violate the Alaska Constitution's equal access provisions, and was constitutionally applied when the Board made its customary and traditional use finding for the Chitina fishery in 2003, we affirm this portion of the superior court's rulings. Because there is no indication that the Board actually relied on the per capita consumption of wild foods in the users' home communities when applying 5 AAC 99.010(b) and because that information may be relevant to the subsistence inquiry, we reverse this ruling by the superior court.

## II. FACTS AND PROCEEDINGS

### A. Facts

The Chitina fishery is located along the Copper River, about 250 miles east of Anchorage and 250 miles south of Fairbanks. The Ahtna Tene Nené (Ahtna) people have been fishing in the Copper River Basin for at least the past millennium. The Ahtna people originally utilized dipnets to catch salmon, but they later adopted fishwheels, which provided a more efficient means to catch large numbers of fish. After World War II, the construction of highways from Alaska's population centers brought many non-Natives to the area who adopted the Ahtna methods of dipnet fishing.

In the 1970s, the Board split the basin into two subdistricts separated by the Chitina–McCarthy Road Bridge: the Chitina subdistrict to the south and the Glennallen subdistrict to the north. Due to differences between dipnet and fishwheel fishing methods, Chitina was more popular with non-Natives and visitors while Glennallen was largely populated by Natives and year-round residents. As AFWCF noted:

> Dipnetters could fish more effectively [south of] the bridge, where high canyon walls surrounding a deep, fast river resulted in salmon being concentrated in back eddies. Fishwheelers ... found productive fishing [north of] the bridge, where braiding of the river resulted in a slower current and numerous spots where a wheel could more easily be set up, tended, and maintained.

Non-locals preferred dipnets because they were easier to transport, did not require a permanent presence near the river, and suitable dipnet sites were more easily accessible.

The Board first examined the use of Chitina salmon stocks in 1984; by examining only uses by rural residents, it found no customary and traditional subsistence uses of salmon in the Chitina subdistrict. The Chitina area was then designated for "personal use," open to all residents for dipnet fishing, while the Glennallen area was classified for "subsistence use," thereby open only to local residents who could use either fishwheels or dipnets.

---

1. AFWCF is a nonprofit corporation and sister organization to the Alaska Outdoor Council (AOC), an association of clubs and individual members dedicated to the preservation of outdoor pursuits in Alaska. AFWCF's mission is to assist AOC through education, research, and litigation. The Chitina Dipnetters Association is an organizational member of AOC that lobbies for and proposes changes to the dipnet regulations in Chitina. Because AFWCF is the litigating party representing these organizations, we refer to both groups collectively as AFWCF throughout this opinion.

After our 1985 decision in *Madison v. Alaska Department of Fish and Game*,[2] the Board briefly reclassified all personal use fisheries as subsistence fisheries. In 1986, the Legislature rewrote the subsistence statute[3] to comply with our decision in *Madison* and the Board of Fisheries and Board of Game jointly adopted 5 AAC 99.010(b), which listed the eight criteria used to determine if fish or game populations were being customarily and traditionally used for subsistence (commonly referred to as a "C & T determination").[4] After the revised subsistence statute was enacted, the Board reinstated a personal use classification to the Chitina subdistrict. The Board continued to label the Chitina fishery as a personal use fishery until 1999, when it made a positive customary and traditional use determination. In 2003, the Board revisited the issue once again; it held a seven-day regulatory meeting and invited public comment and participation. After reviewing the extensive evidence presented, it changed the classification of Chitina back to personal use. The Board was asked to reconsider this classification in 2005 and 2008, but it declined, finding no new evidence that warranted reconsideration of its personal use classification for the Chitina fishery.

**B. Proceedings**

On January 13, 2009, shortly after the Board refused to reclassify the Chitina fishery at its 2008 meeting, AFWCF filed its First Amended Complaint for Declaratory Judgment and Injunctive Relief. AFWCF claimed that 5 AAC 99.010(b) was unconstitutional on its face and as applied. The State of Alaska, Alaska Board of Fisheries, and Alaska Department of Fish and Game (the State) filed their answer on February 23, 2009. AFWCF filed a motion for summary judgment on March 12, 2009. Ahtna moved to intervene and filed an answer to the original complaint on April 16, 2009. The State and Ahtna then filed cross-motions for summary judgment, and oral argument on all motions was held on June 24, 2009.

On December 31, 2009, the superior court issued a decision and order granting declaratory judgment largely for the State and Ahtna. Specifically, it found that the regulation itself was valid; that the Board's classification does not violate the uniform application and equal protection provisions of the Alaska Constitution; and that the Board properly applied 5 AAC 99.010(b), except with regard to criterion eight. With regard to criterion eight, the superior court found that the

**2.** 696 P.2d 168 (1985) (holding that the Board's criteria for Tier II users that were based on proximity to the resource were inconsistent with the first subsistence statute).

**3.** *See* ch. 52, § 6, SLA 1986 (codified as AS 16.05.258).

**4.** 5 AAC 99.010(b) provides:

Each board will identify fish stocks or game populations, or portions of stocks or populations, that are customarily and traditionally taken or used by Alaska residents for subsistence uses by considering the following criteria:

(1) a long-term consistent pattern of noncommercial taking, use, and reliance on the fish stock or game population that has been established over a reasonable period of time of not less than one generation, excluding interruption by circumstances beyond the user's control, such as unavailability of the fish or game caused by migratory patterns;

(2) a pattern of taking or use recurring in specific seasons of each year;

(3) a pattern of taking or use consisting of methods and means of harvest that are characterized by efficiency and economy of effort and cost;

(4) the area in which the noncommercial, long-term, and consistent pattern of taking, use, and reliance upon the fish stock or game population has been established;

(5) a means of handling, preparing, preserving, and storing fish or game that has been traditionally used by past generations, but not excluding recent technological advances where appropriate;

(6) a pattern of taking or use that includes the handing down of knowledge of fishing or hunting skills, values, and lore from generation to generation;

(7) a pattern of taking, use, and reliance where the harvest effort or products of that harvest are distributed or shared, including customary trade, barter, and gift-giving; and

(8) a pattern that includes taking, use, and reliance for subsistence purposes upon a wide diversity of fish and game resources and that provides substantial economic, cultural, social, and nutritional elements of the subsistence way of life.

Board failed to properly articulate the objective standard being used. Accordingly, the court remanded the case and instructed the Board to define the term "subsistence way of life" as used in criterion eight of its regulation, allow the plaintiffs an opportunity to supplement the record given that new definition, and then reapply the regulation consistent with that new evidence. The court also ordered the Board not to consider per capita consumption of wild foods in users' home communities.

On remand, the Board generated a proposal to define "subsistence way of life" for purposes of customary and traditional use findings and, after public notice and a hearing, adopted the regulation. After receiving a report of agency action on remand in April 2010 and holding a status conference regarding the new regulations, the superior court granted final judgment on October 21, 2010. AFWCF now appeals. The State and Ahtna cross-appeal to contest the superior court's conclusion that it was improper for the Board to consider the per capita consumption of wild foods in the users' home communities in applying 5 AAC 99.010(b)(8).

## III. STANDARD OF REVIEW

■ Whether summary judgment was properly granted is a question of law and is reviewed de novo.[5] In matters involving agency regulations, we will "substitute our judgment for that of the [B]oard when interpreting the Alaska Constitution and issues of law."[6] However, if a case may be fairly decided on statutory grounds or on an alternative basis, we will not address the constitutional issues.[7]

[4, 5] When reviewing the Board's policy or the Board's application of law to a particular set of facts, decisions that are based on Board expertise, we apply a reasonableness standard.[8] "When a regulation is adopted in accordance with the Administrative Procedure Act, and the legislature intended to give the agency discretion, we review the regulation by ascertaining whether the regulation is consistent with its authorizing statutory provisions and whether 'the regulation is reasonable and not arbitrary.' "[9]

## IV. DISCUSSION

### A. 5 AAC 99.010(b) Is Facially Valid And Constitutional.

#### 1. 5 AAC 99.010(b) is consistent with its authorizing statutes, reasonable, and not arbitrary.

■ Alaska Statute 16.05.251(a)(6) states that "[t]he Board of Fisheries may adopt regulations it considers advisable ... for ... classifying as commercial fish, sport fish, guided sport fish, personal use fish, subsistence fish, or predators or other categories essential for regulatory purposes...." The superior court held that this statutory mandate plainly authorized the Board to classify a fish stock as subsistence or personal use. The superior court noted that the subsistence statute, AS 16.05.258, requires the Board of Fisheries to "identify the fish stocks ... that are customarily and traditionally taken or used for subsistence."[10] The superior court

**5.** State, Dep't of Fish & Game v. Manning, 161 P.3d 1215, 1219 (Alaska 2007).

**6.** Koyukuk River Basin Moose Co–Mgmt. Team v. Bd. of Game, 76 P.3d 383, 386 (Alaska 2003).

**7.** State, Dep't of Health & Soc. Servs. v. Valley Hosp. Ass'n, 116 P.3d 580, 584 (Alaska 2005); Alaska Trademark Shellfish, LLC v. State, Dep't of Fish & Game, 91 P.3d 953, 957 (Alaska 2004) (appeals should not be decided on constitutional grounds when narrower grounds are available).

**8.** Koyukuk, 76 P.3d at 386.

**9.** State v. Kenaitze Indian Tribe, 83 P.3d 1060, 1064 (Alaska 2004) (footnotes omitted) (quoting Interior Alaska Airboat Ass'n v. State, Bd. of Game, 18 P.3d 686, 689–90 (Alaska 2001)).

**10.** AS 16.05.258(a). The terms "customary and traditional" and "subsistence uses" are defined in AS 16.05.940. AS 16.05.940(7) defines "customary and traditional" as "the noncommercial, long-term, and consistent taking of, use of, and reliance upon fish or game in a specific area and the use patterns of that fish or game that have been established over a reasonable period of time taking into consideration the availability of the fish or game." AS 16.05.940(33) defines "subsistence uses" as "the noncommercial, customary and traditional uses of wild, renewable resources by a resident ... of the state for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption, and for the customary trade, barter, or sharing for personal

rejected AFWCF's argument that the subsistence statutes are sufficiently defined such that adopting regulations is unnecessary, reasoning that "clarification is often necessary" in the area of subsistence policy and "[a]dopting regulations such as 5 AAC 99.010 is within the discretion of the agency." These statutes instruct the Board to inquire into "the taking of, use of and reliance upon fish for subsistence purposes." In 5 AAC 99.010(b), the Board of Fisheries did just that; it created eight criteria that it will consider when identifying fish stocks that are customarily and traditionally taken or used for subsistence.[11] The superior court went through each criterion and explained how each furthers the subsistence inquiry and helps the Board distinguish between subsistence and other uses. The superior court rejected AFWCF's argument that the criteria result in an improper rural preference or improper kinship requirement and upheld the constitutionality of the regulation.

AFWCF brings several challenges to the constitutionality of the regulation. First, it maintains that 5 AAC 99.010(b) is invalid because it is "not consistent with, reasonably necessary to implement, or a reasonable interpretation of the subsistence statute" because "the subsistence statute was designed and intended to protect the subsistence rights of urban Alaskans, specifically the rights of Fairbanks based Chitina dipnetters." Thus, AFWCF claims that the regulation is invalid because it declines a subsistence classification for the preferred fishing area of these urban residents. AFWCF explains that the current regulation originated with an effort by the joint boards to limit subsistence classifications to rural residents. Although the law no longer contains this explicit limitation, which was invalidated by our decision in McDowell v. State,[12] AFWCF argues the regulation is still designed to bring about the same result.

We reject the assertion that the statute necessarily leads to an impermissible urban/rural distinction even though part (a) was previously invalidated; if anything, the Board's 1999 determination indicates the falsity of this premise. If AFWCF is to successfully contest the constitutionality of part (b) of the regulation, it must identify a problem with part (b) instead of hinging claims on the already-invalidated part (a) and alleging that the same issues carry over to corrupt part (b) as well.

AFWCF also argues that the subsistence statute is "clear and complete" and does not require further application of agency expertise because it includes a definition of "customary and traditional" and "subsistence uses." AFWCF asserts that the regulation is used to "justify comparing user groups rather than uses of the fish stock or game population." AFWCF also contends that the eight enumerated criteria are not necessary to implement the subsistence statute because, rather than clarifying ambiguous statements by the legislature, the regulation introduces criteria that have no statutory basis and "inevitably lead to determinations in favor of rural residents that live near the resource and against non-rural users who travel to the resource." It also claims that by requiring the Board to examine community use patterns, the regulation leads to an impermissible focus on users rather than uses, which we struck down in Payton v. State.[13] Based upon these conclusions, AFWCF asks us to invalidate the entire regulation because it "inappropriately restricts [AFWCF's] ability to establish a subsistence fishery by imposing standards that shift the

or family consumption; in this paragraph, 'family' means persons related by blood, marriage, or adoption, and a person living in the household on a permanent basis."

11. See supra note 4.

12. 785 P.2d 1 (Alaska 1989) (subsistence statute cannot limit admission to subsistence user group to rural residents).

13. 938 P.2d 1036 (Alaska 1997). In Payton, we held that "the Board did not err in considering the presence of 'successive generations,' but that it did err when it required the current users of salmon to be related to past generations of users" when applying 5 AAC 99.010(b). Id. at 1042. We acknowledged that the Board must determine if customary and traditional uses exist in a given area to make a subsistence classification, but held that it may not require a familial relationship between current residents and prior generations. Id.

focus of the C & T inquiry from the statutory requirements of consistency and duration to unrelated considerations such as the cultural, social, and economic context in which the harvest takes place."

We decline AFWCF's request and instead hold that 5 AAC 99.010(b) is constitutional, consistent with its enabling statute and reasonably necessary to carry out the purposes of the subsistence statute. Alaska Statute 16.05.251(a)(6) explicitly gives the Board authority to adopt regulations for classifying fisheries as commercial, sport, personal use, subsistence or other. Alaska Statute 16.05.258(a) requires the Board of Fisheries to "identify the fish stocks ... that are customarily and traditionally taken or used for subsistence." When read together, these statutes allow the Board to create regulations for classifying fish and for identifying the particular fish stocks that align with subsistence use patterns. We also reject AFWCF's assertions that the subsistence statute is clear enough on its own terms so that this regulation is unnecessary and it is only used to implement a rural bias. The subsistence statute provides a general definition of the requirements for subsistence use, but the regulation provides definitions of each specific component and guidelines for how they should be applied. The joint Board of Fisheries and Board of Game enacted 5 AAC 99.010(b) to provide a list of criteria that were relevant to consider when fulfilling their statutory mandate.

AFWCF argues that the subsistence statute was intended to grant subsistence rights to any long-term users of an area, but this argument ignores the clear legislative intent in passing AS 16.05.940, which was to provide for actual subsistence uses and preserve a traditional culture and way of life.[14] AFWCF cites *Madison v. State, Department of Fish & Game*[15] in support of its proposition, but *Madison* only barred the complete exclusion of urban residents from the classification of subsistence users, it did not state that the subsistence statute was meant to classify those who do not have a "traditional, social, or cultural relationship to and dependence upon the wild renewable resources produced by Alaska's land and water" as subsistence users.[16]

AFWCF also maintains that it is improper for the Board to consider the "cultural, social and economic context in which harvest takes place," but as noted above the legislature specifically intended the Board to take this information into account. Personal use fisheries may meet the subsistence statute's consistency and duration requirements, but they may also fail to carry the cultural, social, spiritual, and nutritional importance that the subsistence statute protects.[17] Since 5 AAC 99.010(b) is consistent with its authorizing statutes and is reasonable and not arbitrary, it is valid.

## 2. 5 AAC 99.010(b) does not violate the equal access provisions of Article VIII of the Alaska Constitution.

AFWCF also challenges the regulation as a violation of the equal access provisions of article VIII of the Alaska Constitution, specifically citing sections 3 (Common Use),[18] 15 (No Exclusive Right of Fishery),[19]

---

**14.** Ch. 1, § 1(a)(3), SSSLA 1992 ("[C]ustomary and traditional uses of Alaska's fish and game originated with Alaska Natives, and have been adopted and supplemented by many non-Native Alaskans as well; these uses among others, are culturally, socially, spiritually, and nutritionally important and provide a sense of identity for many subsistence users.").

**15.** 696 P.2d 168 (Alaska 1985).

**16.** *See id.; see also* ch. 1, § 1(a)(1), SSSLA 1992 for intent of the subsistence statute.

**17.** Ch. 1, § 1(a)(3), SSSLA 1992.

**18.** Alaska Const. art. VIII, § 3 provides: "Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use."

**19.** Alaska Const. art. VIII, § 15 provides, in relevant part: "No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery...." AFWCF cited Section 5, not Section 15, as a part of the equal access clauses in its opening brief but this was apparently a typographical error, as Section 5 deals with "facilities and improvements."

and 17 (Uniform Application).[20] The superior court held that article VIII's equal protection and uniform application provisions were not implicated by the Board's classification of the Chitina fishery. The court explained that the equal access provisions protect disparate treatment of similarly situated users, not disparate classifications of fish stocks. As the court stated, "[t]here is no constitutional requirement that the resource itself be treated equally in each area where it is found." The fact that residents may have to travel to participate in a subsistence fishery outside their preferred area does not mean equal access has been denied or the constitution has been violated.[21]

AFWCF maintains that the "eight criteria [of 5 AAC 99.010(b) have] so often been misapplied by the Boards and by Superior Court judges and have led to so many equal protection violations that this Court must strike the entire regulation." The core of AFWCF's argument is that this regulation allows the Board to impermissibly distinguish among users, not among uses, in violation of the equal access provisions in article VIII of the Alaska Constitution. AFWCF relies on our decisions in *Madison,*[22] *State v. Morry,*[23] and *McDowell v. State*[24] to argue that all Alaskans are eligible to be subsistence users. It then claims that 5 AAC 99.010(b) deprives Alaskan dipnetters of the equal access rights vindicated in these decisions because it treats the urban dipnetters as non-subsistence users. According to AFWCF, this regulation implements an "implicit rural preference" and therefore must be invalidated.[25]

We agree with the superior court that this regulation does not implicate the equal access, uniform application, or equal protection clauses of either the state or federal Constitutions.[26] The regulation affects the classification of fisheries, but does not subject any user group, i.e., urban or rural users, to disparate treatment. It does not affect any individual's ability to obtain a subsistence permit or to utilize that permit in a subsistence area, but merely decides whether the use patterns in that specific area support a finding of customary and traditional uses. This regulation does not affect any user's admission to a user group and none of the criteria are based on residency; therefore, it does not violate the holdings of *McDowell* and its progeny. Citizens do not have a constitutional right to have a subsistence fishery in their preferred area; although this determination denies a subsistence priority in the Chitina subdistrict, it is not per se unconstitutional.

### B. The Board's Application Of 5 AAC 99.010(b) To The Chitina Fishery In 2003 Was Proper.

■ The superior court held that the Board's application of 5 AAC 99.010(b) to the

---

**20.** Alaska Const. art. VIII, § 17 provides: "Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation."

**21.** *See State v. Kenaitze Indian Tribe,* 894 P.2d 632, 640–41 (Alaska 1995) ("Inconvenience is in no sense the equivalent of a bar to eligibility for participation in subsistence hunting and fishing and does not suffice to trigger an analysis under the equal access clauses.... The fact that residents of nonsubsistence areas must travel in order to utilize subsistence permits is not a limitation to their admission to a user group.").

**22.** 696 P.2d 168 (Alaska 1985) (regulation limiting subsistence uses to uses by rural residents inconsistent with authorizing statute).

**23.** 836 P.2d 358 (Alaska 1992) (the Board lacked statutory authority to adopt eligibility criteria for first tier subsistence users).

**24.** 785 P.2d 1 (Alaska 1989) (statute limiting subsistence users to rural residents unconstitutional under article VIII).

**25.** In *McDowell,* we held that the portion of the 1986 subsistence statute that limited the subsistence user classification to rural residents was per se impermissible and violated the equal access clauses of the Alaska Constitution. *McDowell,* 785 P.2d at 12; *see also State v. Manning,* 161 P.3d 1215, 1220 (Alaska 2007) (holding subsistence statute's overt residency requirement impermissible per se and under equal protection analysis). AFWCF relies on *McDowell* as the basis for its equal protection argument here, but in *McDowell* we clarified that not all regulations distinguishing among users are impermissible, but "only that the residency criterion used in the 1986 act which conclusively excludes all urban residents from subsistence hunting and fishing ... is unconstitutional." *McDowell,* 785 P.2d at 9.

**26.** *See* Alaska Const. art. VIII; U.S. CONST. amend. XIV, § 1.

Chitina fishery in 2003 was proper except for the unreasonable and arbitrary application of criterion eight. The superior court correctly noted that its review of the Board's determination was limited to ensuring that "the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision-making." [27] The court found that the Board generally met this standard when applying 5 AAC 99.010(b)(1)-(7), but it also found that the Board "employed varying, ill-defined, subjective definitions of the requirement that salmon stock be used as part of a 'subsistence way of life'" when applying criterion eight. The court held that reasoned decision-making required the application of an objective definition that was supported by law and remanded the case to the Board so it could formulate and apply a "definite, shared, and objective definition of criterion eight's 'subsistence way of life' requirement." Upon remand, the Board generated a proposal to define "subsistence way of life" for purposes of customary and traditional use determinations and, after public notice and a hearing, adopted the regulation.[28] After applying this new definition, the Board maintained its classification of the Chitina fishery as personal use. The superior court accepted the Board's revised application of the regulation and entered final judgment.

AFWCF argues that "[t]he transcript of Board deliberations shows clearly and convincingly that the Board focused primarily on the users rather than the use" while applying the eight criteria of 5 AAC 99.010(b) in 2003. AFWCF specifically takes issue with the application of criteria one, three, five, six, and eight, claiming that the Board impermissibly compared user groups when analyzing these factors. AFWCF maintains that instead of remanding to the Board to clarify the standard it used when applying criterion eight, the trial court should have struck the regulation in its entirety. It further argues that the subsistence statute already clearly defined what is meant by a "subsistence way of life" in its definition of "subsistence uses" and that the Board should not have been "ordered to again create its own subjective definition." Even as amended, AFWCF continues to object to criterion (b)(8) on the grounds that it "seems to require a *user* who can claim that the resource is necessary to provide the basic necessities of life" and declares that the Board will respect these claims only when made by rural indigenous users. In support, AFWCF points out that in 2003 the Board was "specifically directed to compare Native use in Glennallen with non-Native use in Chitina" whereas the Board in 1999 was "specifically cautioned against comparing Native use and non-Native use" in the wake of our decision in *Payton v. State*.[29] AFWCF argues that the report from the Division of Subsistence, which the Board relied on while reexamining its classification for Chitina in 2003, emphasized this improper Native/non–Native comparison and led the Board in 2003 to improperly apply its own regulation.

The Board's application of 5 AAC 99.010(b) was proper. As we noted in the previous section, the subsistence statute provides guidance for interpreting its terms, but the Board still has discretion to define its key terms, such as "long-term," "reliance," and "subsistence way of life." [30] As long as the Board employs an objective standard in do-

---

**27.** *Libertarian Party of Alaska, Inc. v. State*, 101 P.3d 616, 622 (Alaska 2004).

**28.** The Board's new regulation defined "subsistence way of life" as "a way of life that is based on consistent, long-term reliance upon fish and game resources for the basic necessities of life." 5 AAC 99.005 (Effective June 10, 2010).

**29.** 938 P.2d 1036 (Alaska 1997); *see also McDowell v. State*, 785 P.2d 1 (Alaska 1989) (subsistence statute cannot limit admission to subsistence user group to rural residents).

**30.** *See Libertarian Party*, 101 P.3d at 622 ("In determining whether a regulation is reasonable and not arbitrary courts are not to substitute their judgment for the judgment of the agency. Therefore review consists primarily of ensuring that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making.") (citations omitted); *see also Lakloey, Inc. v. Univ. of Alaska*, 157 P.3d 1041, 1045 (Alaska 2007) ("When reviewing the merits of an agency's decision ... the 'reasonable and not arbitrary' test applies to questions about agency regulations and the agency's interpretation of those regulations.").

ing so, its application of the statute is valid.[31] The Board must take a hard look at the relevant criteria and engage in reasoned decision-making, but it is not required to strictly adhere to its earlier determinations, especially when provided new contradictory data.[32]

Although the customary and traditional use determination here is a close call, it is possible for different boards to come to different conclusions, as demonstrated by the Board's 1999 and 2003 findings. These differing conclusions only highlight the need for this regulation, which provides some guidance for the application of otherwise general terms and principles; without it, nearly every decision of the Board could seem arbitrary. The Board focused on use patterns in the Chitina subdistrict when making its customary and traditional use determination and, contrary to AFWCF's contentions, it did not impermissibly focus on users. Thus, its application of the regulation was proper.

### C. The Board Of Fisheries May Take Into Consideration The Per Capita Consumption Of Wild Foods In The Users' Home Communities When Applying 5 AAC 99.010(b)(8).

■ The superior court held that it was improper for the Board to consider the per capita consumption of wild foods in the home community of the user when making its customary and traditional use findings for the Chitina subdistrict. It reasoned that this comparison would effectively reflect an impermissible urban/rural distinction that would serve only to disqualify use by urban residents. It held that this information was "immaterial to the reliance placed on the fish and game by the user" and thus could not be taken into account by the Board.

The State and Ahtna challenge this ruling in their cross-appeal. The State claims that

the community harvest data was relevant, reasonable, and not arbitrary, and did not otherwise violate substantive due process standards. It asserts that community per capita harvest information has probative value as part of a body of evidence presented to the Board regarding the extent and depth of reliance on fish and game resources by Chitina fishers. Thus, it argues that the data serves a logical purpose and the Board should be allowed to consider it on a case-by-case basis. The State also argues that community data was relevant and notes that separate statistical data on the harvest of wild foods only by Chitina fishery participants was not available. The State explained that this community data was considered along with supplemental information indicating that individual harvest levels in the Chitina fishery were higher than the community per capita average and, taken together, this information was not unduly prejudicial to urban users.

The State contends that, because the question of whether a subsistence fishery will be created does not restrict admission to a resource user group and therefore does not implicate the equal access provisions of the Alaska Constitution, *McDowell*'s limitations on urban/rural distinctions do not apply. The State points out that the Board is allowed to take community per capita harvest information into account when establishing non-subsistence areas so it is already established that this information is relevant to the subsistence inquiry. The State also argues that, because the Board may consider the use of community-wide data on the cost of food and gas when awarding subsistence permits, it is similarly reasonable for the Board to consider community harvest data when classifying use patterns in fisheries since both data sets indicate the ability of the subsistence user to obtain alternate food sources if

**31.** *See Alaska Exch. Carriers Ass'n v. Regulatory Comm'n of Alaska,* 262 P.3d 204, 208–09 (Alaska 2011) ("When a matter involves agency expertise we apply a 'reasonable basis' test, giving deference to the agency's specialized knowledge and expertise.") (citations omitted).

**32.** *See Libertarian Party,* 101 P.3d at 622; *Alaskan Crude Corp. v. State, Dep't of Natural Res., Div. of Oil & Gas,* 261 P.3d 412, 419 (Alaska 2011) (holding that reasonable basis standard applies to agency's interpretation of its own regulation, which means "defer to the agency unless its interpretation is plainly erroneous and inconsistent with the regulation") (citations omitted).

subsistence use is restricted.[33] The State also notes that the information challenged here was not conclusive, but only reflected common knowledge that urban communities are less subsistence-dependent than rural communities. Finally, the State adds that while AFWCF makes "much of the perceived flaws in the survey prepared by the Subsistence Division," the community per capita harvest data was not even collected as part of that survey.

Ahtna emphasizes the importance of community-based data, noting that "[s]ubsistence uses include[ ] patterns of sharing, customary trade, barter and reliance that extend beyond just the individual user to the broader community, to a pattern of consistently sharing with elders, widows, and neighbors in need." Ahtna maintains that it is necessary to look at communal use patterns to see if they align with a subsistence way of life and customary and traditional uses. Ahtna believes that AFWCF's objection to Chitina's personal use classification arises from its frustration with the State's acknowledgment of non-subsistence use areas; since these fishers cannot fish near their homes, they protest when "a fishery established by urban residents ... hundreds of miles distant is a personal use fishery rather than a subsistence fishery."

Additionally, the State and Ahtna maintain that board members have enough expertise to give this information the proper weight it deserves and it is not improper "absent a showing of undue reliance on it in the face of better available information." The State contends that the record shows no such improper reliance on this data by board members nor does it demonstrate a disqualification based on community residence. In the absence of a finding that board members even took per capita data into account when making their classification decision in 2003, the State argues that the superior court's opinion regarding this data is merely advisory, because it proscribes information that the State should not consider in the future. The State argues that even if this data is improper, the "mere presence in the Board's administrative rule-making record of [misleading] data ... cannot support invalidation of a Board regulation."

AFWCF counters that per capita consumption information is irrelevant to the Board's decision because the lower numbers for urban areas "reflect usage by *all* residents of those areas, including many who do not engage in any subsistence activity whatsoever." AFWCF emphasizes that this information only leads to customary and traditional use determinations biased in favor of rural users; it points to the use of this data by federal regulators as an example of how such data leads to the rural/non-rural distinctions that are central to the federal subsistence inquiry but prohibited under the Alaska Constitution. Thus, it argues that federal consideration of this data shows that the State's use of it is suspect because state law prohibits making rural/non-rural distinctions. AFWCF avows that the community per capita harvest information is not relevant to the Board's customary and traditional use inquiry and can only mislead board members about the actual use patterns of urban residents.

We agree with the superior court's conclusion that it would be improper for the Board to rely exclusively on community per capita consumption to establish customary and traditional uses, but the categorical exclusion of such data is also unwarranted. Although it would be improper for the Board to compare actual per capita use by Glennallen fishery users with community-wide average use in urban areas, per capita consumption data of a specific community is not necessarily problematic. This data is relevant to establish use patterns and it may be reasonable in some contexts if the Board chose to consider it. If this information were used to determine whether an individual user is qualified as a subsistence user, the per capita consumption data would be invalid under *Manning*. Here, however, the Board is looking at subsistence use patterns, not individual use, and therefore looking at community data may be relevant, especially when ascertaining whether a community of users really depends on this resource for their livelihood

**33.** *See Manning,* 161 P.3d at 1224.

or can easily obtain other means of subsistence.[34]

Additionally, there is no evidence to suggest that this data was actually relied upon when the Board made its customary and traditional use finding for Chitina in 2003. Without such evidence, it is simply another piece of information in the administrative record and may not be a basis for overturning the regulation or the finding.[35] No board member indicated that he relied on this information when making his decision; only one member even mentioned the data, and he indicated that it was not probative, and he went on to vote against changing the classification of Chitina. Without a showing that this information was used in an improper manner to influence the decision of the Board, a categorical exclusion is unwarranted.

## V. CONCLUSION

Because the regulation is valid on its face and as applied and there is no violation of the equal access provisions of our constitution, we AFFIRM the decision of the superior court upholding the regulation. We REVERSE the ruling that it was improper for the Board to be presented with information regarding the per capita consumption of wild foods.

CHRISTEN, Justice, not participating.

---

34. When enacting the most recent version of the subsistence statute, the legislature stated its purposes and findings. These findings indicated that "there are Alaskans ... who have a ... *dependence upon* the wild renewable resources produced by Alaska's land and water...." Ch. 1, § 1(a)(1), SSSLA 1992 (emphasis added). "[T]hese Alaskans share ideals of respect for nature, the emphasis of using resources wisely, and the value and dignity of a way of life in which they use Alaska's fish and game *for a substantial*

*portion of their sustenance ...."* Ch. 1, § 1(a)(2), SSSLA 1992 (emphasis added). The subsistence statutes must protect these uses where such dependence for sustenance is demonstrated.

35. We agree with the State that 5 AAC 99.010 has nothing to do with distinguishing between users and their ability to participate in a fishery, but rather pertains to the classification of fisheries themselves.