*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KENNETH H. MANNING, | ) | |
| | ) | Supreme Court No. S-15121 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KN-11-00367 CI |
| v. | ) | |
| | ) | OPINION ON REHEARING |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FISH & GAME, KEVIN M. SAXBY, | ) | No. 7036 – August 28, 2015 |
| and AHTNA TENE NENÉ, INC., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Anna Moran and Charles T. Huguelet, Judges.

Appearances: Kenneth H. Manning, pro se, Kasilof, Appellant. Michael G. Mitchell, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee State of Alaska. Brenda B. Page, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee Saxby. John M. Starkey, Law Office of John Sky Starkey, LLC, Anchorage, for Appellee Ahtna Tene Nené, Inc.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

WINFREE, Justice.

## I.    INTRODUCTION

The Alaska Board of Game promulgated regulations managing caribou hunting in Game Management Unit 13. The regulations allow hunting under three types of permits: a community harvest subsistence permit, an individual subsistence permit, or a non-subsistence drawing permit. A hunter challenged the regulations on constitutional and statutory grounds, arguing that they wrongfully interfered with his subsistence hunting rights, and also sought a judicially imposed public reprimand of an assistant attorney general representing the Board. The superior court dismissed the claim against the attorney, granted summary judgment upholding the regulations, and awarded partial attorney's fees to the State and an intervenor defendant. The hunter appeals. We affirm the dismissal and summary judgment orders, but vacate the attorney's fees awards and remand for further proceedings.

## II.    FACTS AND PROCEEDINGS

This case involves a challenge to the Board of Game's 2010 amendments to regulations for subsistence caribou hunting in Game Management Unit 13, known as the Nelchina basin.[1] Under the governing statute, if a game population can be harvested consistent with sustained yield principles, the Board must "determine the amount of the harvestable portion that is reasonably necessary for subsistence uses."[2]  (This is

---

[1]    We recently discussed the history of caribou hunting regulation in the Nelchina basin in *Alaska Fish & Wildlife Conservation Fund v. State* (*AFWCF II*), ___ P.3d ____, Op. No. 6992 at 2-5, 2015 WL 1393374, at *1-2 (Alaska Mar. 27, 2015) (concerning subsistence moose and caribou hunting in Game Management Units 11, 12, and 13, collectively referred to therein as the "Copper Basin") and *Ahtna Tene Nené v. State, Department of Fish & Game*, 288 P.3d 452, 455-57 (Alaska 2012) (concerning subsistence moose and caribou hunting in Game Management Unit 13 only, referred to therein as the "Nelchina basin").

[2]    AS 16.05.258(b).

commonly called the "amount reasonably necessary for subsistence," or "ANS."[3])

Subsistence uses are managed at either the Tier I or Tier II level.[4] Tier I management is appropriate when the Board concludes that the allowable harvest is sufficient to provide a reasonable opportunity for all subsistence uses; otherwise Tier II management is appropriate.[5] Subsistence hunting under Tier II is more limited, with permits allocated based on specific eligibility criteria.[6]

In 1993 the Board determined that the ANS for Nelchina caribou was "100% of the allowable harvest" because the demand for subsistence hunting "exceed[ed] supply." The Board therefore managed the Nelchina caribou hunt under Tier II. Following a stream of complaints that the Tier II system did not provide sufficient subsistence opportunity for Nelchina caribou, the Board began developing new regulations in 2006. The Board made new findings about the customary and traditional uses of Nelchina caribou and adopted regulations requiring that hunters conform to identified practices. In March 2009 the Board determined the ANS to be 600-1,000 animals, accounting for the demand of only those hunters following the customary and traditional use practices identified in its findings. Based on the revised ANS and that year's estimated allowable harvest of 1,000 animals, the Board transitioned management of the Nelchina caribou hunt from a Tier II to a Tier I system. The regulations created two types of subsistence hunting permits: a community harvest permit and an individual

---

[3]     *See* 5 Alaska Administrative Code (AAC) 99.025(c)(1) (2014).

[4]     AS 16.05.258(b); *State, Dep't of Fish & Game v. Manning*, 161 P.3d 1215, 1216-17 (Alaska 2007).

[5]     AS 16.05.258(b); *Manning*, 161 P.3d at 1216-17; 5 AAC 92.990(a)(47), (48).

[6]     *Manning*, 161 P.3d at 1216-17; 5 AAC 92.062.

permit.[7] The regulations were challenged in superior court and invalidated on the grounds that (1) they were unconstitutional and (2) the Board's decision to change the caribou hunt from Tier II to Tier I was arbitrary and unreasonable and violated the Alaska Administrative Procedure Act's notice requirement.[8]

The Board addressed the invalidated regulations at its October 2010 meeting. After reviewing extensive evidence on population and hunting trends for Nelchina caribou, the Board again calculated the ANS at 600-1,000 animals. Because the estimated allowable harvest of 2,300 caribou was greater than the ANS, the Board concluded that the Nelchina caribou subsistence hunt must be managed under Tier I. The Board then reinstated the bifurcated community/individual subsistence hunt system, with revisions, and also allowed issuance of non-subsistence hunt drawing permits.[9]

The regulations establish that any group of 25 or more persons may apply for a community harvest subsistence permit entitling each group member to harvest one caribou during the regulatory year.[10] The group must follow the customary and traditional use pattern identified by the Board for community subsistence hunts.[11] Individual subsistence permit holders also are entitled to harvest one caribou per household during the regulatory year, but are not subject to the community harvest

---

[7] *See Ahtna Tene Nené v. State, Dep't of Fish & Game*, 288 P.3d 452, 455-56 (Alaska 2012).

[8] *Id.* at 456. The ruling was appealed, but we dismissed the appeal as moot after the Board again amended its regulations. *Id.* at 458, 463.

[9] 5 AAC 85.025(a)(8). *See generally AFWCF II*, ___ P.3d ___, Op. No. 6992 at 2-5, 2015 WL 1393374, at *1-2 (Alaska Mar. 27, 2015) (describing amended permitting scheme and restrictions); *Ahtna Tene Nené*, 288 P.3d at 456-57.

[10] 5 AAC 85.025(a)(8), 92.072(c)(1).

[11] 5 AAC 92.072(c)(1)(D).

hunt's customary and traditional use restrictions.[12] Up to 300 caribou may be taken each year under community harvest permits, while no cap is placed on the total number of caribou that may be taken under individual permits.[13] All subsistence permit holders are subject to the same hunting regulations and their hunting seasons and areas are the same.[14] And all subsistence permits prohibit taking more than one caribou per household and hunting caribou in any other location during the permit year.[15]

In April 2011 Kenneth Manning filed suit against the Alaska Department of Fish and Game (Department) and Assistant Attorney General Kevin Saxby. Manning sought an injunction preventing the Department from implementing the Nelchina caribou community subsistence hunt regulations on various constitutional and statutory grounds, and sought a judicially imposed reprimand of Saxby for alleged violations of law while he was representing the Board. Ahtna Tene Nené (Ahtna) was permitted to intervene as a defendant. Shortly thereafter the superior court dismissed the claim against Saxby, concluding that he was entitled to discretionary and qualified immunity and that the court could not grant the specific relief Manning sought.

In late October 2011 the Department issued an emergency order closing the Nelchina caribou hunt to non-subsistence drawing permit holders. Manning, who held an individual subsistence hunt permit, moved for an "emergency expedited ex parte preliminary injunction" enjoining the closure, but the superior court denied the motion because Manning lacked standing. In early December 2011 the Department closed the

---

[12]    5 AAC 85.025(a)(8), 92.071(a).

[13]    5 AAC 85.025(a)(8).

[14]    *Id.*; 5 AAC 92.072(d).

[15]    5 AAC 92.050(a)(4)(I).

individual subsistence hunt, and three days later the Department closed the community harvest subsistence hunt.

Manning filed a summary judgment motion in June 2012, and the Department and Ahtna filed cross-motions for summary judgment. In April 2013 the superior court denied Manning's motion and granted the Department's and Ahtna's cross-motions, concluding that the Board's decision to change the Nelchina caribou hunt from a Tier II hunt to a Tier I hunt was reasonable and consistent with statute[16] and that the new regulations were constitutional and did not violate the public trust doctrine. The court also rejected Manning's argument that the Department provided insufficient notice under the Administrative Procedure Act before it closed the individual and community harvest subsistence hunts by emergency order.

During and following the summary judgment proceedings Manning filed several motions to disqualify the presiding judge and a motion for new proceedings, alleging the judge was biased and incompetent. Each motion was denied.

The Department and Ahtna moved for attorney's fees, and the superior court awarded them partial fees as prevailing parties under Alaska Civil Rule 82. The court concluded that 15 of the 30 counts in Manning's complaint requested constitutional relief and were not frivolous, so Manning could not be liable for attorney's fees incurred in connection with those claims under AS 09.60.010.[17] The court awarded attorney's

_____

[16]    Specifically the superior court concluded: (1) the decision to change the ANS for Nelchina caribou was reasonable and supported by sufficient evidence; (2) the ANS range calculated by the Board in October 2010 was reasonable and supported by sufficient evidence; and (3) the Board's decision to transition from a Tier II to a Tier I hunt was supported by sufficient evidence.

[17]    AS 09.60.010(c)(2) provides that a court:

[M]ay not order a claimant to pay the attorney fees of the

(continued...)

fees for all time spent on "non-constitutional, procedural issues," and for 50% of the time spent on work in which the type of claim could not be identified. The court also reduced the hourly rates the Department and Ahtna claimed by half because Manning was indigent, resulting in final awards of $4,573 to the Department and $1,080 to Ahtna.

Manning appeals.

## III.  STANDARD OF REVIEW

"We review grants of motions to dismiss and grants of summary judgment de novo . . . ."[18]

"We presume that regulations are valid and we place the burden of proving otherwise on the challenging party":[19]

> We review an agency's regulation for whether it is "consistent with and reasonably necessary to implement the statutes authorizing [its] adoption." Toward this end we consider: (1) whether [the agency] exceeded its statutory authority in promulgating the regulation; (2) whether the regulation is reasonable and not arbitrary; and (3) whether the

---

[17]    (...continued)
opposing party devoted to claims concerning constitutional rights if the claimant . . . did not prevail in asserting the right, the action or appeal asserting the right was not frivolous, and the claimant did not have sufficient economic incentive to bring the action or appeal regardless of the constitutional claims involved.

[18]    *Smith v. State*, 282 P.3d 300, 303 (Alaska 2012) (citing *Interior Cabaret, Hotel, Rest. & Retailers Ass'n v. Fairbanks N. Star Borough*, 135 P.3d 1000, 1002 (Alaska 2006)).

[19]    *West v. State, Bd. of Game*, 248 P.3d 689, 694 (Alaska 2010) (citing *Lakosh v. Alaska Dep't of Envtl. Conservation*, 49 P.3d 1111, 1114 (Alaska 2002)).

regulation conflicts with other statutes or constitutional provisions.[20]

Reviewing whether a regulation is reasonable and not arbitrary "consists primarily of ensuring that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making."[21]

"We apply the reasonable basis standard to questions of law involving 'agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions.' "[22] We also review an agency's application of law to facts under the reasonable basis standard.[23] But we exercise our independent judgment in reviewing whether an agency action is consistent with the Alaska Constitution.[24]

"We review de novo whether the trial court applied the law correctly in awarding attorney's fees."[25]

---

[20]     *Wilber v. State, Commercial Fisheries Entry Comm'n*, 187 P.3d 460, 464-65 (Alaska 2008) (first alteration in original) (quoting *Grunert v. State*, 109 P.3d 924, 929 (Alaska 2005)).

[21]     *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001) (citing *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1319 (Alaska 1994); *Gilbert v. State, Dep't of Fish & Game*, 803 P.2d 391, 398 (Alaska 1990)).

[22]     *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014) (quoting *Marathon Oil Co. v. State, Dep't of Natural Res.*, 254 P.3d 1078, 1082 (Alaska 2011)).

[23]     *Alaska Fish & Wildlife Conservation Fund v. State, Dep't of Fish & Game, Bd. of Fisheries* (*AFWCF I*), 289 P.3d 903, 907 (Alaska 2012) (citing *Koyukuk River Basin Moose Co-Mgmt. Team v. Bd. of Game*, 76 P.3d 383, 386 (Alaska 2003)).

[24]     *Id.*

[25]     *Lake & Peninsula Borough Assembly v. Oberlatz*, 329 P.3d 214, 221 (Alaska 2014) (alteration omitted) (quoting *Marron v. Stromstad*, 123 P.3d 992, 998 (continued...)

## IV. DISCUSSION

### A. The Regulation Managing The Nelchina Caribou Hunt Under Tier I Is Consistent With The Statute And Is Reasonable And Not Arbitrary.

Manning argues that the Board's decision to manage the Nelchina caribou hunt under Tier I — executed through 5 AAC 85.025(a)(8)[26] — is unlawful, and that the hunt must be managed under Tier II. But the Board's decision is lawful so long as 5 AAC 85.025(a)(8) is consistent with the statute and is reasonable and not arbitrary.[27] Alaska Statute 16.05.258(b) requires the Board to adopt regulations managing a game population under Tier II only "if the harvestable portion of the . . . population is not sufficient to provide a reasonable opportunity for subsistence uses."[28] We construe Manning's argument to be that 5 AAC 85.025(a)(8) is inconsistent with its authorizing statute — AS 16.05.258(b) — because it impermissibly allows the Board to manage the subsistence hunt under Tier I when the allowable harvest of Nelchina caribou is insufficient to provide a reasonable opportunity for subsistence uses. Manning's argument thus turns on whether the Board lawfully could conclude that a reasonable

---

[25] (...continued)
(Alaska 2005)) (internal quotation marks omitted).

[26] 5 AAC 85.025(a)(8) establishes bag limits and hunting seasons for Nelchina caribou under a Tier I management scheme.

[27] *See Wilber v. State, Commercial Fisheries Entry Comm'n*, 187 P.3d 460, 464-65 (Alaska 2008) (citing *Grunert v. State*, 109 P.3d 924, 929 (Alaska 2005)). It is undisputed that the Board has statutory authority to promulgate regulations managing subsistence game hunts. *See* AS 16.05.258. The fact that the Board previously determined the Nelchina caribou hunt had to be managed under Tier II does not affect the standard of review or analysis. *See AFWCF I*, 289 P.3d at 912 (noting Board of Fisheries "is not required to strictly adhere to its early determinations, especially when provided new contradictory data").

[28] AS 16.05.258(b)(4).

opportunity for subsistence uses exists. The meaning of "reasonable opportunity for subsistence uses" involves the Board's expertise and is committed to the Board's discretion by statute,[29] so the Board's determination that a reasonable opportunity exists is consistent with statute if the determination has a reasonable basis.[30]

Manning argues the Board cannot conclude that a reasonable opportunity for subsistence uses exists because the Board relied on an ANS value it had "unlawfully reduce[d]." And because the Board must manage a hunt at the Tier II level if the harvestable surplus is below the ANS,[31] the Board could not reasonably conclude that a reasonable opportunity for subsistence uses existed if it relied on an improper ANS value.

Manning argues the ANS determination is unlawful in two ways: (1) the Board violated the Alaska Constitution by relying on impermissible user characteristics in its ANS calculation; and (2) the ANS determination is unreasonable. Although the ANS determination was published as a regulation — 5 AAC 99.025(a)(4) — the

---

[29]    *See* AS 16.05.258(f) ("For purposes of this section, 'reasonable opportunity' means an opportunity, *as determined by the appropriate board*, that allows a subsistence user to participate in a subsistence hunt or fishery that provides a normally diligent participant with a reasonable expectation of success of taking of fish or game." (emphasis added)).

[30]    *See Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014) (citing *Marathon Oil Co. v. State, Dep't of Natural Res.*, 254 P.3d 1078, 1082 (Alaska 2011)).

[31]    ALASKA DEP'T OF FISH & GAME, DIV. OF SUBSISTENCE, GUIDELINES FOR PREPARING OPTIONS FOR THE ALASKA BD. OF FISHERIES & ALASKA BD. OF GAME FOR AMOUNT REASONABLY NECESSARY FOR SUBSISTENCE (ANS) FINDINGS 1 (vers. 1.0, 2009); *see also* 5 AAC 99.025(c)(1) (defining ANS as "the total amount of animals from a population that must be available for subsistence hunting in order to provide a reasonable opportunity for subsistence uses").

determination is an application of law to facts which is reviewed for a reasonable basis.[32] The Board's discretion under this standard is limited, however: "The Board's ultimate decisions must be reasonably related to the purposes of the subsistence law; in other words, the Board may not manipulate [an underlying determination] simply to achieve a predetermined outcome."[33]

### 1. The Board's ANS calculation was not based on unconstitutional factors.

Manning asserts that the Board improperly used "rail belt and urban residency, 'community,' and/or Ahtna racial customs and traditions to *pre-determine* who is or is not a subsistence user" in calculating the ANS, and asserts that consideration of these factors violates the Alaska Constitution. (Emphasis in original.) But AS 16.05.258(b) refers to ANS in terms of subsistence *uses*, not *users*.[34] The record reveals that the Board included a broad variety of subsistence uses in its ANS calculation. And even if the Board had defined subsistence uses of Nelchina caribou to include only local community hunting practices, it would not necessarily have violated the Alaska Constitution — considering certain users' patterns to define the subsistence uses placing demand on a game population affects only that game population's classification; it "does not affect any individual's ability to obtain a subsistence permit

---

[32] *See AFWCF I*, 289 P.3d at 907 (citing *Koyukuk River Basin Moose Co-Mgmt. Team v. Bd. of Game*, 76 P.3d 383, 386 (Alaska 2003)) (application of law to facts is reviewed for reasonable basis); *see also State v. Kenaitze Indian Tribe*, 894 P.2d 632, 641 (Alaska 1995) (stating fish and game allocation decisions generally are reviewed for reasonable basis).

[33] *Native Vill. of Elim v. State*, 990 P.2d 1, 11 (Alaska 1999).

[34] AS 16.05.258(b) states, "[T]he board shall determine the amount of the harvestable portion that is reasonably necessary for subsistence uses."

or to utilize that permit in a subsistence area."[35]   The Board's subsistence definition applies equally to all of Alaska's citizens.  Accordingly, the Board's ANS calculation does not implicate, nor violate, the equal access, uniform application, or equal protection clauses of the Alaska Constitution.[36]

### 2. The Board's ANS calculation is reasonable.

Manning also asserts that the ANS calculation was improperly reduced for the purpose of converting the hunt to Tier I and implementing a community subsistence hunt.  But Manning points to nothing in the record indicating the Board "manipulate[d]" the ANS "simply to achieve a predetermined outcome."[37]  On the contrary, considerable evidence in the record justifies the Board's ANS calculation and demonstrates that the Board took "a hard look at the salient problems and . . . genuinely engaged in reasoned decision making."[38]

The Board reviewed extensive evidence on long-term harvest, customary and traditional use patterns, and caribou population trends, and it considered a number of proposals for defining subsistence uses of Nelchina caribou in making its ANS determination.  It concluded the 600-1,000 ANS best fit the available data after considering at least eight possible ANS options.  The Board identified substantial evidentiary support justifying the customary and traditional use definition applied in its ANS determination.  And the Board continued to consider a number of proposed

---

[35]     *AFWCF I*, 289 P.3d at 910.

[36]     *See id.*

[37]     *Native Vill. of Elim*, 990 P.2d at 11.

[38]     *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001) (citing *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1319 (Alaska 1994); *Gilbert v. State, Dep't of Fish & Game*, 803 P.2d 391, 398 (Alaska 1990)).

management regimes — including a Tier II hunt — after calculating the ANS, suggesting the ANS calculation was not merely a pretext for switching to a Tier I hunt. The Board concluded that "Tier II is off [the] table" only after comparing the adopted ANS to the harvestable surplus.

Although there is some evidence that the Board preferred that the ANS determination ultimately allow for a Tier I hunt, it does not appear that the ANS was improperly manipulated to achieve a predetermined outcome. The record provides sufficient evidentiary support demonstrating that the Board's ANS calculation is both procedurally and substantively reasonable. Accordingly the Board reasonably concluded that there is a reasonable opportunity for subsistence uses. Managing the Nelchina caribou hunt under Tier I through 5 AAC 85.025(a)(8) is consistent with the statute and is reasonable and not arbitrary.

B.   **The 2011 Closures By Emergency Order Did Not Violate The Administrative Procedure Act's Notice Requirements.**

Manning contends that the Department violated the Administrative Procedure Act by failing to give permit applicants sufficient notice that the individual subsistence and the non-subsistence drawing hunts "may be closed by Emergency Order *prior to* achieving the annual harvest quota, while allowing or granting a priority preference for 'community' permit hunters (CHP) to continue to hunt the same resource prior to the annual harvest quota." (Emphasis in original.) Manning appears to be referring to the emergency closures of the Nelchina caribou hunt in 2011.[39]

_____

[39]   Although Manning refers to the individual subsistence and non-subsistence drawing hunt closures in his brief, Manning's Administrative Procedure Act challenge in the superior court involved only the individual and community harvest subsistence hunt closures; the court previously had denied Manning standing to challenge the drawing hunt closure. Accordingly we consider Manning's Administrative Procedure
(continued...)

Alaska Statute 16.05.060 authorizes closures by emergency orders, which have the force of law.[40] Emergency orders are not subject to the Administrative Procedure Act, so no notice is required prior to their issuance.[41] Manning's concern about the three-day difference in the emergency closures of the individual subsistence hunt and the community subsistence hunt has little to do with notice; to the extent his concern is about equal protection, his argument is undeveloped and we do not consider it.

## C. The Claim Against Saxby Was Properly Dismissed.

The superior court dismissed Manning's claim against Saxby on the alternative grounds of discretionary function immunity, official immunity, and the court's lack of authority to grant the relief requested. Manning provides no authority establishing that the superior court has general jurisdiction to issue a public reprimand for attorney misconduct extrinsic to court proceedings.[42] Nor does Manning cite any authority that the superior court has general jurisdiction to issue a reprimand against a public official for conduct extrinsic to court proceedings. Insofar as Manning may have been requesting declaratory relief against Saxby, such relief is not available in this case:

---

[39] (...continued)
Act challenge on appeal to relate only to the individual and community harvest subsistence hunt emergency closures.

[40] We note that Manning's 2011 individual subsistence hunt permit expressly states: "This caribou hunt may be closed by Emergency Order (EO). It is your responsibility to be aware of hunt closures."

[41] AS 16.05.060(c), 44.62.190.

[42] The proper forum for seeking attorney discipline for such misconduct is the Alaska Bar Association. *See* Alaska Bar R. 10(c). A superior court may, of course, sanction an attorney for misconduct occurring *in the course of* court proceedings. *See, e.g.*, Alaska R. Civ. P. 16(f), 77(j); *see also* Alaska Bar R. 9(c).

simply asking that a public official be reprimanded does not present a justiciable controversy.[43]

### D.    Manning's Other Issues Lack Merit.

Manning argues that conditioning Tier I eligibility on "community criteria" violates article I, section 1 and article VIII, sections 3, 15, and 17 of the Alaska Constitution, and that these arguments must be reviewed under strict scrutiny.[44] We construe these arguments to allege that the community harvest permit eligibility criteria are unconstitutional. But we upheld the constitutionality of these criteria in *AFWCF II*.[45]

Manning also argues that the superior court erred by denying him standing to challenge the 2011 drawing hunt emergency closure order. The issue is now moot,

---

[43]    *See State v. Am. Civil Liberties Union of Alaska*, 204 P.3d 364, 368 (Alaska 2009) (noting that under Alaska's declaratory judgment statute, AS 22.10.020(g), declaratory relief is appropriate only when an "actual controversy" exists); *see also Thuma v. Kroschel*, 506 N.W.2d 14, 21 (Minn. App. 1993) (holding allegation that city mayor acted "ultra vires," without more, could not support an action for declaratory judgment because there was no genuine, adversarial conflict); *Port Isabel/S. Padre Island Taxpayers Ass'n v. S. Padre Island*, 721 S.W.2d 405, 406-07 (Tex. App. 1986) (refusing to grant declaratory relief for town's alleged failure to put a tax rollback provision on the ballot when a later tax rollback provision made it onto the ballot but was defeated because declaratory relief would be "nothing more than a reprimand to the [town] for its rejection of [the] first petition").

[44]    Manning also argues the criteria violate the public trust doctrine, but the public trust doctrine was "constitutionalize[d]" in the common use clause of article VIII, section 3; so Manning's public trust argument is simply another way of arguing a section 3 violation. *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 493 (Alaska 1988).

[45]    ___ P.3d ___, Op. No. 6992 at 6-10, 2015 WL 1393374 at *2-4 (Alaska Mar. 27, 2015).

as the order applied only to the 2011-2012 Nelchina caribou hunt, and we decline to address it.[46]

Manning briefly raises several other points on appeal. Specifically he contends that: the regulations violate the sustainable yield requirement of article VIII, section 4 of the Alaska Constitution; the prohibition on Unit 13 permit holders hunting caribou or moose elsewhere in the state is unconstitutional; the restrictions on a killed caribou's use are unlawful; the regulations "unlawfully grant and provide a special preference priority granting new aboriginal rights in violation [of the] Alaska Native Claims Settlement Act"; and the denials of his motions regarding the presiding judge's alleged bias were erroneous. But because his arguments on these points are conclusory and inadequately developed, we consider them waived.[47]

## E.    The Attorney's Fees Awards Were Calculated Improperly And Must Be Vacated.

The superior court awarded the Department and Ahtna attorney's fees under Alaska Civil Rule 82 for defending 15 of the 30 counts in the complaint, reasoning that Manning was immune under AS 09.60.010(c)(2) from paying fees related to the 15 counts the court believed concerned constitutional claims. Manning argues that the court erred because each of the 30 counts concerns a constitutional right.

The superior court did not indicate which counts of Manning's complaint concerned constitutional rights. But based on our de novo review, we conclude that 19

---

[46]    *See Ahtna Tene Nené v. State, Dep't of Fish & Game*, 288 P.3d 452, 457 (Alaska 2012) ("A claim is moot if it 'has lost its character as a present, live controversy.' " (quoting *Kleven v. Yukon-Koyukuk Sch. Dist.*, 853 P.2d 518, 523 (Alaska 1993))).

[47]    *See Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991).

of the 30 counts concerned protection of constitutional rights.[48] Fifteen counts clearly concerned protection of constitutional rights, including the right to equal access to subsistence hunting opportunities,[49] the right to sustainable yield management,[50] and the right to equal protection.[51] Other counts present closer questions. Three counts involved claims that the Board failed to consider relevant statutory factors and that its administrative process was flawed, leading to its promulgation of the allegedly unconstitutional community harvest system and the alleged "elimination" of individual subsistence rights. Although these claims can be construed to assert a statutory right to a lawful administrative process, they are more correctly viewed as seeking to protect the constitutional common use right from improper infringement by agency action. Likewise, Manning alleged in one count that under AS 16.05.258(b) — requiring that game management provide a reasonable opportunity for subsistence uses — the regulations exceeded the Board's statutory authority. Although this facially is a statutory argument, AS 16.05.258(b) functions to protect Alaskans' constitutional right to equal

---

[48]     Specifically, counts 1, 2, 3, 4, 8, 9, 10, 11, 12, 14, 15, 16, 18, 21, 23, 26, 27, 28, and 29 concerned constitutional rights.

[49]     *See* Alaska Const. art. VIII, §§ 3, 17; *State, Dep't of Fish & Game v. Manning*, 161 P.3d 1215, 1224 (Alaska 2007); *McDowell v. State*, 785 P.2d 1, 8-9 (Alaska 1989); *see also Alaska Fish & Wildlife Conservation Fund v. State*, 347 P.3d 97, 102 (Alaska 2015) ("Section 15 provides that there shall be '[n]o exclusive right or special privilege of fishery . . . in the natural waters of the State'; though the clause addresses only fishing, we apply its underlying principles when interpreting sections 3 and 17." (alterations in original) (quoting Alaska Const. art. VIII, § 15)).

[50]     Alaska Const. art VIII, §4.

[51]     *Id.* art. I, § 1.

access to subsistence hunting opportunities[52] — even absent this statute, Manning would have a constitutional basis for his claim against the Board for failing to protect this right.[53] But it is not evident that the remaining 11 counts concerned constitutional rights, so Rule 82 attorney's fees might be awarded for those claims.

As we recently explained in *Lake & Peninsula Borough Assembly v. Oberlatz*, "[d]etermining whether [claimants] are immune from paying attorney['s] fees to . . . defendants requires consideration of the nature *of each claim* against those defendants."[54] And "Rule 82 attorney['s] fees may be awarded only for work that would not have been necessary but for a non-constitutional claim; AS 09.60.010(c)(2) applies to work in which a constitutional claim is implicated in any way."[55]

---

[52]     *See id.* art. VIII, §§ 3, 17; *Manning*, 161 P.3d at 1224; *McDowell*, 785 P.2d at 8-9.

[53]     *Lake & Peninsula Borough v. Oberlatz*, 329 P.3d 214, 227 (Alaska 2014) ("It does not matter that the deprivations [of the plaintiffs' constitutional rights] also violated statutes designed to regulate the [constitutional] right . . . or that the statutes provide the rule of law for determining whether the constitutional right has been infringed. The ultimate question is whether the [claimants] sought to protect themselves from deprivation of their constitutional rights . . . .").

[54]     *Id.* (emphasis added).

[55]     *Id.* at 228 (citing *Fox v. Vice*, 131 S. Ct. 2205, 2215 (2011)). *Fox v. Vice* involved the federal rule that a plaintiff cannot be liable for attorney's fees under 42 U.S.C. § 1988 unless the " 'action was frivolous, unreasonable, or without foundation.' " 131 S. Ct. at 2213 (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978)). That rule and AS 09.60.010(c)(2) are analogous in that both serve to protect plaintiffs seeking to protect important rights from paying attorney's fees if they do not prevail, unless the defendant incurred the fees defending against a claim that did not concern protection of an important right — e.g., a frivolous or non-constitutional claim. *Compare id.* (stating § 1988 intended to remove cost barrier of vindicating one's civil rights), *with* Debate on C.S.H.B. 145 (FIN) Before the Senate, (continued...)

The superior court awarded attorney's fees for work done on "non-constitutional, procedural issues." It is unclear whether the court was referring to work defending solely against non-constitutional claims or work on procedural issues involving the merits of a constitutional claim. Rule 82 attorney's fees are allowable only for the former. Work on general procedural issues, such as the motions to disqualify the presiding judge, cannot be disconnected from Manning's constitutional claims. Unless the Department or Ahtna can provide sufficiently detailed documentation segregating the time spent on specific procedural work by claim type, the court must assume that the billed time for procedural work was all connected to Manning's constitutional claims. This assumption protects against the possibility of improperly awarding fees for work responding to constitutional claims. On remand, the superior court should not award attorney's fees for work on a procedural issue unless the applicant provides the requisite documentation that the procedural issue is related solely to a non-constitutional claim.

Based on its conclusion that 15 of Manning's 30 counts involved constitutional claims, the superior court also awarded the Department and Ahtna attorney's fees for 50% of work for which the nature of the claim involved was not identified. Such a pro rata approach is improper. Although we do not hold that a superior court can never award partial fees for work when the type of claim cannot be clearly identified, the court must ensure that fees are not awarded for work involving constitutional claims.[56] Simply awarding a pro rata share of attorney's fees based on the

---

**55** (...continued)
23d Leg., 1st Sess. (May 20, 2003) (statements of Sen. Seekins) ("What [AS 09.60.010] really does is it retains the essence of the public interest litigant doctrine for the cases that relate to our most important rights, the constitutional rights. And actually it enlarges those protections.").

**56** As the United States Supreme Court explained in *Fox*:

(continued...)

ratio of non-constitutional to constitutional claims "would be to risk requiring a plaintiff to pay defendants' attorney[']s fees incurred in defeating his [constitutional] claims."[57] Such an approach is impermissible under AS 09.60.010(c)(2) and may not be applied on remand. Defendants seeking attorney's fees for work on non-constitutional claims must "submit appropriate documentation to meet 'the burden of establishing entitlement to an award.' "[58] "If defendants do not demonstrate that the work would not have been performed in order to defend against the [constitutional claims], or to put it differently,

---

[56] (...continued)

The essential goal in shifting fees [under 42 U.S.C. § 1988] is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. . . .

But the trial court must apply the correct standard . . . . That means the trial court must determine whether the fees requested would not have accrued but for the frivolous claim. . . . A trial court has wide discretion when, but only when, it calls the game by the right rules.

131 S. Ct. at 2216-17 (citations omitted).

[57] *Harris v. Maricopa Cnty. Superior Court*, 631 F.3d 963, 972 (9th Cir. 2011) (reversing pro rata award of 42 U.S.C. § 1988 attorney's fees based on ratio of frivolous to non-frivolous claims); *see also McKenna v. City of Phila.*, 582 F.3d 447, 458 (3d Cir. 2009) (rejecting calculation of attorney's fees award " 'using a simple mathematical approach based on the ratio between a plaintiff's successful and unsuccessful claims' " (quoting *McKenna v. City of Phila.*, Civ. Action No. 07-110, 2008 WL 4435939, at *13 (E.D. Pa. Sept. 30, 2008))).

[58] *Fox*, 131 S. Ct. at 2216 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

but for the need to defend against the [non-constitutional] claims, fees associated with that work cannot be awarded, even in part."[59]

## V. CONCLUSION

We AFFIRM the superior court's orders dismissing the claim against Saxby and granting summary judgment for the Department and Ahtna, VACATE the attorney's fees awards, and REMAND for further proceedings consistent with this opinion.

---

[59] *Harris*, 631 F.3d at 973.

We do not suggest that a prevailing constitutional claimant seeking attorney's fees under AS 09.60.010(c)(1) necessarily bears the same burden. *Cf. Fox*, 131 S. Ct. at 2215 n.3 (noting test governing prevailing plaintiffs' 42 U.S.C. § 1988 attorney's fees is more generous than that governing prevailing defendants' fees). *But see Oberlatz*, 329 P.3d at 227 n.38 ("We note that the [plaintiffs] are not entitled to an attorney['s] fees award for work done solely on claims against the [defendant] that did not concern the [plaintiffs'] constitutional rights . . . ." (citing AS 09.60.010(c)(1))).

# In the Supreme Court of the State of Alaska

**Kenneth H. Manning**,  )
                                               )       Supreme Court No. **S-15121**
              Appellant,       )

v.                          )                **Order**
                                              )      Petition for Rehearing

**State of Alaska**, **et al.**,     )
                                               )
            Appellees.        )       Date of Order: **8/28/15**
                                                )

Trial Court Case # **3KN-11-00367 CI**

Before:     Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices

Both Kenneth H. Manning and the State of Alaska filed petitions for rehearing after our May 15, 2015 opinion issued. All parties were given an opportunity to be heard on the petitions. After considering the petitions and responses,

IT IS ORDERED:

1.      Manning's petition for rehearing is DENIED.

2.      The State's petition for rehearing is GRANTED, and the paragraph beginning at the bottom of page 16 and carrying over to the bottom of page 17 is modified as shown in the following redlined format:

\*\*\*\*\*

The superior court did not indicate which counts of Manning's complaint concerned constitutional rights. But based on our de novo review, we conclude that 19

of the 30 counts concerned protection of constitutional rights.[48]  Fifteen counts clearly concerned protection of constitutional rights, including the right to equal access to subsistence hunting ~~access~~ opportunities,[49] the right to sustainable yield management,[50] and the right to equal protection.[51]  Other counts present closer questions.  Three counts involved claims that the Board failed to consider relevant statutory factors and that its administrative process was flawed, leading to its promulgation of the allegedly unconstitutional community harvest system and the alleged "elimination" of individual subsistence rights.  Although these claims can be construed to assert a statutory right to a lawful administrative process, they are more correctly viewed as seeking to protect the constitutional common use right from improper infringement by agency action.  Likewise, Manning alleged in one count that under AS 16.05.258(b) — requiring that game management provide a reasonable opportunity for subsistence uses — the regulations exceeded the Board's statutory authority.  Although this facially is a statutory argument, AS 16.05.258(b) functions to protect Alaskans' constitutional rights to equal

---

[48]     Specifically, counts 1, 2, 3, 4, 8, 9, 10, 11, 12, 14, 15, 16, 18, 21, 23, 26, 27, 28, and 29 concerned constitutional rights.

[49]     *See* Alaska Const. art. VIII, §§ 3, 17; *State, Dep't of Fish & Game v. Manning*, 161 P.3d 1215, 1224 (Alaska 2007); *McDowell v. State*, 785 P.2d 1, 8-9 (Alaska 1989); *see also Alaska Fish & Wildlife Conservation Fund v. State*, 347 P.3d 97, 102 (Alaska 2015) ("Section 15 provides that there shall be '[n]o exclusive right or special privilege of fishery . . . in the natural waters of the State'; though the clause addresses only fishing, we apply its underlying principles when interpreting sections 3 and 17." (alterations in original) (quoting Alaska Const. art. VIII, § 15)).

[50]     Alaska Const. art VIII, § 4.

[51]     *See* ~~Alaska Const.~~ *Id*. art. I, § 1~~; id. art. VIII, §§ 3, 4, 15, 17~~.

access to subsistence hunting access opportunities [52] — even absent this statute, Manning would have a constitutional basis for his claim against the Board for failing to protect subsistence hunting access this right.[53] But it is not evident that the remaining 11 counts concerned constitutional rights, so Rule 82 attorney's fees might be awarded for those claims.

---

[52]    *ee id.* art. VIII, §§ 3, 17; *Manning*, 161 P.3d at 1224; *McDowell*, 785 P.2d at 8-9.

[53]    *Lake & Peninsula Borough v. Oberlatz*, 329 P.3d 214, 227 (Alaska 2014) ("It does not matter that the deprivations [of the plaintiffs' constitutional rights] also violated statutes designed to regulate the [constitutional] right . . . or that the statutes provide the rule of law for determining whether the constitutional right has been infringed. The ultimate question is whether the [claimants] sought to protect themselves from deprivation of their constitutional rights . . . .").

*****

3.    Opinion No. 7008, issued on May 15, 2015, is WITHDRAWN, and Opinion 7036 is issued on this date in its place, reflecting the changes.

Entered at the direction of the full court.

Clerk of the Appellate Courts

_____/S/_____
Marilyn May

cc:    Supreme Court Justices
       Judge Moran
       Trial Court Appeals Clerk
       Publishers